IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

CHAD JEREMY ADAMS,                )
                                  )
              Plaintiff,          )
                                  )
                                  )      CIV-07-1113-D
v.                                )
                                  )
MUSTANG POLICE DEPARTMENT,        )
et al.,                           )
                                  )
              Defendants.         )

<u>SECOND SUPPLEMENTAL REPORT  AND  RECOMMENDATION</u>

Plaintiff, a state prisoner appearing *pro se* and *in forma pauperis*, brings this civil rights action pursuant to 42 U.S.C. §1983.  In his Complaint filed October 2, 2007, Plaintiff seeks damages for alleged constitutional deprivations and a violation of the Americans with Disabilities Act stemming from his encounter in April 2006 with several officers of the City of Mustang Police Department named as Defendants herein, his transport by MPD Officers to Defendant Integris Canadian Valley Regional Hospital ("Hospital")[1] in April 2006 for medical and mental health treatment Hospital in April 2006, and criminal charges filed against Plaintiff in the District Court of Canadian County, Oklahoma. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C.

---

[1]This Defendant was identified by Plaintiff as Canadian Valley Hospital.  However, this Defendant has answered the Complaint and filed a dispositive motion indicating that  the proper name of this entity is Integris Canadian Valley Regional Hospital.  Therefore, the proper name for the Defendant has been substituted for the name of the Defendant set forth in the Complaint.

§636(b)(1)(B).

I. Count One

Plaintiff's allegations in count one of the Complaint were previously set forth in the Report and Recommendation entered by the undersigned on August 29, 2008 and are adopted by reference herein. Previously, Defendants Canadian County District Attorney's Office ("DA's Office") and Paul Hesse, an Assistant District Attorney for Canadian County ("ADA Hesse"), moved to dismiss the cause of action, and Defendant Integris Canadian Valley Regional Hospital ("Hospital") moved to dismiss or alternatively moved for summary judgment. In a Report and Recommendation entered August 29, 2008, the undersigned recommended, *inter alia*, that Defendants DA's Office and ADA Hesse be dismissed from the cause of action, that Plaintiff's malicious prosecution claim in count one, including the claim of conspiracy to maliciously prosecute Plaintiff, be dismissed as to all Defendants pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim for relief, and that Plaintiff's claim for a violation of the ADA be dismissed as to all Defendants pursuant to 28 U.S.C. §1915A(b) for failure to state a claim for relief. The Order entered September 29, 2008, by District Judge DeGiusti adopted the findings in the Report and Recommendation and dismissed Plaintiff's claims in count one alleging malicious prosecution and a violation of the ADA as to all Defendants pursuant to 28 U.S.C. § 1915A(b). Consequently, the Plaintiff's claims in count one have already been resolved adversely to Plaintiff, and it is not necessary to address the merits of the dismissed claims in the Complaint, including Plaintiff's claims of malicious prosecution, claims of conspiracy to maliciously prosecute Plaintiff, and

claims under the ADA, in connection with the resolution of the municipal Defendants' Motion for Summary Judgment.[2]

## II. Counts Two and Three - Plaintiff's Complaint

In count two, Plaintiff asserts a violation of his Fourth Amendment rights. As factual support, Plaintiff alleges that "police reports" filed by Defendants Brown, Adams, Collins, Crawford, and James "attest to the excessive use of force upon epileptic individual when they responded to 9-1-1 call to 'render aid' to and placing plaintiff in handcuffs and ankle restraints and leaving plaintiff, while in 'ICU,' this way." Complaint, at 3. Plaintiff alleges that on April 4, 2006, unidentified "officers" "responded to an apparent 9-1-1 'attempted suicide' call from individual not at residence, to 'render aid' to plaintiff. No crime had been committed and police entered plaintiffs [sic] residence, through 2 closed doors, and opened bathroom door, with guns drawn upon plaintiff who was unaware of police presence in his residence. Police then report that they TASERED plaintiff, using 3 different TASER cartridges, while plaintiff was in a bathtub, full of water, being electrocuted." Complaint, at 3. Plaintiff further alleges that he was "handcuffed" and his "hands turned white from loss of circulation," that he "refused medical attention," that "police officers ushered EMSA fire/medical from residence and all officers report of [sic] Assault, Battery, and TASERING, again, of handcuffed plaintiff to 'coerce' through 'force [and] fear' Plaintiffs [sic] submission

---

[2]Also previously, Defendant Canadian County moved to dismiss or alternatively moved for summary judgment with respect to Plaintiff's claims against it, and on September 18th, 2008, the undersigned recommended that Defendant Canadian County's Motion for Summary Judgment be granted and that judgment issue in favor of Defendant Canadian County and against the Plaintiff with respect to Plaintiff's remaining claims against this Defendant.

to accept medical attention.  Plaintiff was kept in/placed in metal restraints, to wrists [and] ankles [and] kept this way for 3 days...."  Plaintiff further alleges that "Ofc. Six stood guard over plaintiff, while in I.C.U. refusing to remove metal restraints, placed on [sic] by ofc. Collins." Complaint, at 3.

In count three, Plaintiff asserts a violation of his Fourteenth Amendment rights. Plaintiff alleges that Defendants Six, Adams, Brown, Collins, James, Crawford, and Davis "all violated 'Due Process' of plaintiff...." Complaint, at 4.  As factual support, Plaintiff contends that "officers TASERED plaintiff, while in bathtub full of water, after responding to 9-1-1 call, to 'render aid' to epileptic individual overdosed on prescription Phenobarbitol." Complaint, at 4.  Plaintiff further alleges that "officers all report of [sic] assault and battery, taser useage [sic] after handcuffed, upon plaintiff until plaintiff was 'beaten into submission' to 'accept medical treatment," and "Plaintiff was kept in metal restraints while in I.C.U. without any criminal charges filed upon him, for 3 days, consecutively.  Officers refused to remove restraints upon plaintiff."  Complaint, at 4.  Count three contains an additional allegation concerning "hospital personell [sic]." Complaint, at 4.

III. Standard of Review - Counts Two and Three

Now before the undersigned is the Motion for Summary Judgment filed by Defendants City of Mustang, Adams, James, Crawford, Six, Collins, Brown and Davis (hereinafter "municipal Defendants") pursuant to Fed. R. Civ. P. 56, to which Plaintiff has responded.  Because the individual officers of the Mustang Police Department have raised the affirmative defense of qualified immunity, Plaintiff's claims in counts two and three of

the Complaint must be evaluated under the framework established for this defense.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007)(en banc). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation has been shown, "the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.'" Nelson v. McMullen, 207 F.3d 1202, 1206 (10th Cir. 2000)(quoting Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995)). See Reeves v. Churchich, 484 F.3d 1244, 1250 (10th Cir. 2007)("Once a defendant has raised qualified immunity as a defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct."). A plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case." Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation...." <u>Saucier</u>, 533 U.S. at 202. "Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful." <u>Id.</u> (citing <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  Only if the plaintiff meets this two-part test does the court decide whether the defendant has satisfied the traditional summary judgment burdens of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" <u>Nelson</u>, 207 F.3d at 1205 (quoting <u>Albright</u>, 51 F.3d at 1535).

Summary judgment may be granted only where the pleadings and any supporting documentary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court reviews the evidence and inferences drawn from the record in the light most favorable to the nonmoving party.  <u>Jiron v. City of Lakewood</u>, 392 F.3d 410, 414 (10th Cir. 2004).  A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "Material facts" are "facts which might affect the outcome of the suit under the governing law." <u>Id</u>. In reviewing a motion for summary judgment, a special report[3] is treated as an affidavit, and the plaintiff's complaint is treated as an affidavit as well if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty

---

[3]In <u>Martinez v. Aaron</u>, 570 F.3d 317 (10th Cir. 1978), the Tenth Circuit Court of Appeals established guidelines for the filing of a special report by the appropriate prison or jail authorities elucidating the factual background and subject matter of prisoners' civil rights complaints.

of perjury.  Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

IV. Undisputed Facts

The municipal Defendants' Motion for Summary Judgment sets forth a statement of thirty-six uncontroverted, material facts, and the municipal Defendants have supported each statement of fact with reference to specific evidentiary documents in the record.  Plaintiff was notified of his obligation under Fed. R. Civ. P. 12 and 56 in responding to the municipal Defendants' Motion for Summary Judgment. See Order entered March 24, 2008 (Doc. # 56). Nevertheless, in Plaintiff's responsive pleading Plaintiff sets forth unsworn allegations that are not contained in his verified Complaint.  Plaintiff has not sought to amend his Complaint to include these new allegations.   However, Plaintiff repeatedly attempts to dispute the municipal Defendants' statement of uncontroverted, material facts by "stat[ing], as fact" various unsworn, new allegations.   With respect to Plaintiff's "state[ments], as fact" appearing in his responsive pleading that are not contained in his verified Complaint, these "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998). To the extent the Plaintiff's "state[ments], as fact" set forth for the first time in his responsive pleading include no reference to such evidentiary documents, these "state[ments], as fact" appearing in Plaintiff's responsive pleading are insufficient under Rules 12(d) and 56(e) to create a disputed issue of fact for the purpose of resolving the municipal Defendants' Rule 56 motion.

The following material facts are not disputed for the purpose of resolving the instant

motion:

1. On April 4, 2006, Plaintiff's wife placed a 911 call in Mustang, Oklahoma, to advise that Plaintiff was attempting suicide.

2. Plaintiff admits he attempted suicide on April 4, 2006.

3. Mustang Police Department officials, Sgt. Adams, Ofc. Collins, Cpt. James, and Ofc. Crawford, responded to the 911 call by going to Plaintiff's residence.  Plaintiff admits that these officers' purpose was to render aid.[4]

4. The officers were advised that Plaintiff had slit his wrists and taken an overdose of prescription medication.  When they arrived, rescue personnel were already present, but had not entered the residence.

5.  Taped to Plaintiff's front door was a note which read, "Do **NOT** 'COME IN' - JUST CALL 'WHOEVER', Because 'IT'S' OVER."

6. Sgt. Adams and Ofc. Collins entered Plaintiff's residence, calling out for Plaintiff.  There was no response.  Sgt. Adams and Ofc. Collins cleared several rooms in the home and eventually located Plaintiff in a bathroom.

7.  Plaintiff was lying naked in a tub full of water, and he held a knife to his throat.

8. Sgt. Adams and Ofc. Collins repeatedly ordered Plaintiff to drop the knife, but he refused and threatened to kill the officers if they did not leave his home.

---

[4]Although in Plaintiff's responsive pleading Plaintiff states that he never admitted the officers' purpose in going to his residence was to render aid, Plaintiff's Complaint contains this very assertion of fact. Complaint, at 1.  Thus, there is no factual dispute concerning this statement.

9.   Plaintiff lunged toward Sgt. Adams with his knife and contemporaneously challenged Sgt. Adams to shoot him.   Sgt. Adams retreated into the hallway, but then observed Plaintiff's arm and hand with the knife coming toward him.   Eventually, Plaintiff slammed the bathroom door shut.   Sgt. Adams heard splashing and believed that Plaintiff got back in the tub.[5]

10. Sgt. Adams tried to talk to Plaintiff.   Plaintiff responded with threats indicating his intent to kill the officers.

11.   Due to the confined nature of the area and the need to preserve the safety of Plaintiff and the officers, Sgt. Adams believed that use of a firearm or pepper spray was not appropriate, and he requested Lt. Brown to bring a Taser M26 into the residence.

12.   When officers re-entered the bathroom, Plaintiff still had the knife in his hand.   Sgt. Adams delivered a 5 second Taser pulse.   Plaintiff flailed his arms and attempted to dislodge the darts.[6]

13.   Because Plaintiff continued to make threats to harm the officers, Sgt. Adams deployed

---

[5]Although Plaintiff states that he disputes this statement, he refers only to the "police reports attached."   No evidentiary documents are attached to his responsive pleading.   He also refers to Attachment 6 to the Special Report, which is the police report prepared by Sgt. Adams concerning the April 6, 2006 incident involving Plaintiff.   In this report, Defendant Adams states that Plaintiff "got up out of the tub and began coming towards me with the knife pointed directly at me and saying, 'shoot me...., go ahead.'" Special Report, Att. 6, at 2.   Thus, Defendants' statement is not disputed.

[6]There is a disputed issue of fact as to whether the Taser pulses were effective, in consideration of the allegations in Plaintiff's verified Complaint.

a second pulse from the Taser.[7]

14.  Plaintiff continued to threaten assault or death upon the officers, and he continued to refuse to comply with their demands.

15.  Sgt. Adams deployed a third Taser pulse, but only one dart struck the Plaintiff.[8]

16.  Following several more verbal demands, Plaintiff finally relented and allowed Lt. Brown to place handcuffs on his wrists.

17.  After personnel from the Fire Department examined Plaintiff and Plaintiff was advised that he was going to the hospital, Plaintiff attempted to engage the officers in a physical combat by taking a fighting stance and kicking objects in an attempt to create an area to fight. Plaintiff's body language was such that it appeared to the officers that he wanted to fight.[9]

18.  Plaintiff attempted to remove the handcuffs using a pen.  Officers told him to stop, but he refused to comply.[10]

---

[7]Ibid.

[8]Ibid.  However, Plaintiff admits in his responsive pleading that only one dart struck him with the third Taser pulse.

[9]In his responsive pleading Plaintiff attempts to dispute this statement of uncontroverted fact contained in Defendants' Motion.  However, as support Plaintiff refers to the same evidentiary documents contained in the Special Report as are cited by Defendants in support of Defendants' statement of fact.  These evidentiary documents, which are the reports prepared by Defendants Adams and Collins concerning the incident involving Plaintiff on April 4, 2006, are not inconsistent with the Defendants' statement of uncontroverted fact numbered 17, and therefore this statement is not disputed.

[10]In his responsive pleading Plaintiff attempts to dispute this statement of uncontroverted fact contained in Defendants' Motion.  However, as support Plaintiff refers to the same evidentiary documents contained in the Special Report as are cited by Defendants in support of Defendants' uncontroverted statement numbered 18.  These evidentiary documents, which are the police reports prepared by Defendants Collins, Brown, and Adams concerning the incident involving Plaintiff on

19.  Because he was combative and would not release the pen, Sgt. Adams delivered a

"drive-stun" to the brachial area of Plaintiff's neck, which caused Plaintiff to drop the pen.[11]

20.  Plaintiff escalated his physical threats to the officers, and additional officers were called

to the scene.  Plaintiff resisted efforts to restrain him, and the officers used manual strikes

to the brachial area of his neck in an effort to restrain Plaintiff.  However, the strikes did not

cause Plaintiff to become compliant, and he began kicking at the officers.[12]

21. Leg restraints were placed on Plaintiff by a Mustang police officer.  Rescue personnel

placed Plaintiff on a backboard and transported him to the Hospital, where he was admitted

at 7:45 p.m.[13]

---

April 4, 2006, are not inconsistent with the Defendants' statement of uncontroverted fact numbered 18, and therefore this statement is not disputed.

[11]In his responsive pleading Plaintiff attempts to dispute this statement of uncontroverted fact contained in the municipal Defendants' Motion for Summary Judgment.  However, as evidentiary support Plaintiff refers to Attachment 6 of the Special Report as evidentiary support.  This document is the police report prepared by Defendant Adams, and the report is not inconsistent with Defendants' statement of uncontroverted fact numbered 19.  Therefore, this statement is not disputed.

[12]In his responsive pleading, Plaintiff attempts to dispute this statement of uncontroverted fact contained in the municipal Defendants' Motion.  As evidentiary support, Plaintiff refers to Defendant Collins' police report concerning the incident involving Plaintiff on April 4, 2006, which appears in the Special Report at Attachment 7.  Plaintiff also refers to Defendant Adam's and Defendant Browns' police reports, which appear in the Special Report at Attachments 6 and 8, respectively.  These evidentiary documents are not inconsistent with municipal Defendants' statement of uncontroverted fact numbered 20.  Therefore, this statement is not disputed.

[13]In his responsive pleading, Plaintiff attempts to dispute this statement of uncontroverted fact contained in the municipal Defendants' Motion.  However, Plaintiff only disputes the chronology of the events and the name of the officer who placed the leg restraints on him.  He refers for evidentiary support to the police report prepared by Ofc. Collins concerning the incident involving Plaintiff on April 4, 2006.  In this report, which appears in the Special Report at Attachment 7, Defendant Collins states that nylon leg restraints were placed on Plaintiff by Capt. James before he was strapped to a backboard and placed into the ambulance.

22.  Rescue personnel noted that Plaintiff was combative and determined Plaintiff was "ETOH/DUG OD - life threatening."  Rescue personnel reported that Plaintiff's demeanor was "Abnormal: aggressive, agitated, suspect drug/alcohol use."

23.  While at the Hospital, Plaintiff continued to express his desire to kill himself.

24.  Hospital staff removed two (2) Taser darts from Plaintiff's midsection.  It was noted that Plaintiff had a superficial cut to his left wrist and that he had possibly ingested a potentially lethal amount of Phenobarbital.

25.  Plaintiff was combative with the hospital staff following his transfer to the Hospital's intensive care unit, even threatening to kill a nurse.[14]

26. Ofc. Six relieved Ofc. Crawford and Sgt. Adams at the Hospital.

27.  The Emergency Room physician examined Plaintiff and recorded that Plaintiff had a long history of depression, increasing anger and hostility, and multiple suicide attempts.

28.  Plaintiff was admitted to the care of a psychiatrist, Dr. Farhan Qureshi, M.D.  A licensed mental health professional at the Hospital completed a written mental health assessment and "Licensed Mental Health Professional's Statement," documenting that Plaintiff threatened suicide, that he was abusive to the Hospital's staff and threatened to kill a nurse, and that he was placed in restraints.  The licensed mental health professional found Plaintiff to be a

---

[14]In his responsive pleading, Plaintiff attempts to dispute this statement of uncontroverted fact.  As evidentiary support, Plaintiff refers to the report of Ofc. Collins concerning the incident. Ofc. Collins' report describes Plaintiff's demeanor upon his admission to the Hospital but does not describe Plaintiff's demeanor following his transfer to the intensive care unit of the Hospital.  The documentary evidence cited by the municipal Defendants in support of this statement is an internal record of the Hospital in which Plaintiff's demeanor following his admission to the intensive care unit is described.  There is no dispute as to this statement.

danger to himself and others.

29. While in the intensive care unit of the Hospital, Plaintiff yelled, kicked, screamed, and attempted to hit and kick at others.  He pulled an intravenous line out of his arm.

30. Dr. Qureshi ordered "suicide precautions" and directed that restraints be placed on Plaintiff based on his written finding that alternatives to restraints were unsuccessful.

31. Randelyne J. Peterson, M.Ed., LPC, of the Mobile Assessment Team, completed a Petition for Involuntary Commitment for Plaintiff, in which the mental health professional stated that Plaintiff was a risk of harm to himself and/or others based on his suicide attempt and homicidal ideation.  Peterson also stated that Plaintiff was not competent to consent to or refuse treatment.

32.  Plaintiff's wife completed a third party affidavit at the hospital in support of an Emergency Order of Detention ("EOD").  In the affidavit, Ms. Adams stated that Plaintiff told her he "took all of his remaining Phenobarbitol and had cut his wrists...."  She also noted that Plaintiff "has mentioned wanting to 'blow his head off' several times before in the last 2- 3 weeks."

33. After receiving treatment for his drug overdose, and after he had become sufficiently detoxified, Plaintiff was transferred from the Hospital to the Deaconess Bethany Adult Mental Health Unit on April 5, 2006, at 3:44 p.m., less than 24 hours after he arrived at the Hospital.   Plaintiff was released to outpatient counseling on April 6, 2006, at 4:00 p.m.[15]

---

[15]Although Plaintiff attempts to dispute this statement of uncontroverted fact contained in the municipal Defendants' Motion, Plaintiff does not provide evidentiary support for this assertion. Plaintiff alleged in his Complaint and continues to vigorously assert that he remained in wrist and

V. <u>Warrantless Entry</u>

Plaintiff's allegations in count two of the Complaint can be generously construed to assert that his Fourth Amendment rights were violated by the entry of the officers into his residence on April 4, 2006, without a warrant.  The municipal Defendants do not explicitly seek summary judgment concerning Plaintiff's claim of a Fourth Amendment violation based on the warrantless entry of the Mustang police officers into his residence.  Rather, the municipal Defendants characterize Plaintiff's claim as challenging an unlawful arrest without probable cause and seek summary judgment concerning this characterization of Plaintiff's claim.  There is no allegation or evidence to show that Plaintiff was subjected to a warrantless arrest.   In his Complaint, Plaintiff asserts a 42 U.S.C. § 1983 malicious prosecution claim directed toward the sufficiency of the affidavit supporting the arrest warrant issued against him in Canadian County.  Although a "person unlawfully arrested without legal process can bring a Fourth Amendment claim sounding in false imprisonment," once an arrest warrant is issued there is a distinct "institution of legal process" and only a claim of malicious prosecution may be brought challenging the probable cause determination supporting the warrant's issuance. <u>Wilkins v. DeReyes</u>, 528 F.3d 790, 798-799, 799 n. 5 (10th

---

leg restraints for three consecutive days.  The municipal Defendants cite the Deaconess Hospital In-Patient Registration form appearing in the Special Report as evidentiary support.  This document indicates that Plaintiff was admitted to that facility on April 5, 2006, at 3:44 p.m., and the document shows Plaintiff signed the form and dated it April 5, 2006.  There is no factual dispute with respect to this statement.  <u>See</u> <u>Scott v. Harris</u>, __ U.S. __, 127 S.Ct. 1769,1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

14

Cir. 2008).

The municipal Defendants have asserted in their Motion for Summary Judgment that the state has a legitimate interest in protecting an individual from self-harm and that forced entry into a residence is not unconstitutional under certain circumstances involving an attempted suicide or drug overdose.  Thus, the municipal Defendants have implicitly asserted that the Mustang police officers' warrantless entry into Plaintiff's residence did not violate Plaintiff's Fourth Amendment rights.  Based on the undisputed facts and viewed in the light most favorable to Plaintiff, the undersigned finds that exigent circumstances existed to justify a warrantless entry into Plaintiff's residence by law enforcement officials on April 4, 2006, and therefore no Fourth Amendment violation has been shown.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Courts look to the common law of search and seizure to determine the boundaries of reasonableness in the Fourth Amendment context. Wilson v. Arkansas, 514 U.S. 927,  931 (1995).  In Wilson, the Supreme Court addressed the reasonableness of an entry into a residence by police officers who did not first knock and announce themselves. Id. at 929.  The Court found that the knock-and-announce rule was traditionally recognized at common law as an element of the reasonableness inquiry under the Fourth Amendment. Id. at 934.  However, the Court recognized that the common-law principle of announcement is not an inflexible rule and that officers need not give advance notice of their presence under certain circumstances, including "circumstances presenting a threat of physical violence." Id. at 934-936.  In Brigham City

15

v. Stuart, 547 U.S. 398 (2006), the Supreme Court revisited the Fourth Amendment reasonableness requirement and recognized that the requirement that officers obtain a warrant before entering a residence is obviated by "the need to assist persons who are seriously injured or threatened with such injury." Id. at 403.   "Accordingly, [the Court found] law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id.

Plaintiff admits that the Mustang police officers who entered his residence were made aware prior to their warrantless entry via a 911 call from Plaintiff's wife that Plaintiff was inside his residence and attempting to commit suicide.  It is also not disputed that the officers who approached Plaintiff's residence saw a handwritten sign on Plaintiff's door stating "it's over," an obvious indication Plaintiff intended to commit suicide.  Plaintiff intimates that the officers who entered his residence without a warrant on April 4, 2006, were not motivated by a desire to render assistance to him because they had their weapons drawn.  However, "[t]he officer's subjective motivation is irrelevant" to the Fourth Amendment inquiry. Id. at 404.  The undisputed facts reflect that grave, exigent circumstances existed following the 911 call made by Plaintiff's wife which warranted quick action to prevent Plaintiff from harming himself inside his residence, and therefore the officers' entry was plainly reasonable under the circumstances.   See Russo v. City of Cincinnati, 953 F.2d 1036, 1044 (6ᵗʰ Cir. 1992)(noting court's inability to find "a single case indicating that an officer's attempt to rescue what that officer believes to be a suicidal person does not constitute exigent circumstances").  Accordingly, the municipal Defendants' Motion for Summary Judgment

with respect to the issue of the reasonableness of the officers' warrantless entry into Plaintiff's residence on April 4, 2006, should be granted.

VI. <u>Excessive Force</u>

In counts two and three, Plaintiff asserts that he was subjected to excessive force and the deprivation of due process in violation of the Fourth and Fourteenth Amendments when Mustang police officers entered his residence on April 4, 2006, shot him with a Taser three times while he was "in a bathtub full of water, full of water, being electrocuted," used the Taser again after Plaintiff was handcuffed and he had refused medical attention, "assault[ed]" and" batter[ed]" Plaintiff, and kept him in metal wrist and ankle restraints "for 3 days" while he was being treated for a drug overdose at the Hospital.  In count two, Plaintiff names Defendants Brown, Adams, Collins, Crawford, and James as the individuals who responded to the 911 call at his residence, and he asserts that Defendant "Six stood guard over plaintiff, while in I.C.U. refusing to remove metal restraints, placed on [sic] by ofc. Collins." Complaint, at 3.  Plaintiff names the same Defendants in count three, in which he restates the same claim of the use of "malicious [and] sadistic force by tasering plaintiff [and] allowing plaintiff to be tasered, in water, repeatedly," that Plaintiff was "beaten into submission to accept medical treatment" after he was handcuffed, and that he was "kept in metal restraints while in I.C.U. without any criminal charges filed upon him, for 3 days, consecutively." Complaint, at 4.

It is important for the purpose of this decision to describe the Taser used by the officers in their efforts to restrain Plaintiff on April 4, 2006.  Mustang police officer Adams

states in his report of the incident involving Plaintiff on April 4, 2006, that he used a Taser

M26.  "A Taser like the M26 generates a charge of 50,000 volts, although the total amount

of electricity delivered, and hence the severity of the pain inflicted, depends greatly on how

long the Taser is applied." <u>Casey v. City of Federal Heights</u>, 509 F.3d 1278, 1285 (10th Cir.

2007)(citing Taser International, *Basic Electric Principles*, available at

<u>http://www.taser.com</u>/research/Science/Pages/BasicElectricPrinciples.aspx).

> Upon activation, the Taser fires two darts attached by electrical-conducting wires into the target.  If both darts make contact, a circuit is completed and a five-second electrical charge cycle is initiated.   The cycle is not a continuous flow of electrical current.  Instead, the charge is delivered in the form of electrical pulses.    There are about twelve pulses per second, or approximately sixty pulses per each five-second cycle.  If the darts remain in the target, additional cycles can be delivered by simply re-squeezing the trigger.  The M26 model Taser ... deliver[s] full five-second cycles each time it [is] activated.
> The Taser is not designed to use pain as a principal motivator. Instead, the pulses cause a break in the body's central nervous system signaling, resulting in involuntary muscle contractions. This will generally result in the target falling, if standing, or in preventing a target on the ground from standing.  The effect is generally temporary.  Although infliction of pain as a motivator is not the primary function of a properly deployed Taser, pain is a necessary byproduct of its use.  However, it is also a very useful tool for law enforcement as it is considered to inflict considerably less pain on a suspect than other forms of force available to an officer.

<u>Beaver v. City of Federal Way</u>, 507 F.Supp.2d 1137, 1142-1143 (W.D. Wash. 2007).

The municipal Defendants do not dispute that their entry into Plaintiff's residence and

efforts to restrain him constituted a seizure for Fourth Amendment purposes.  "[A] Fourth

Amendment seizure [occurs] ... when there is a governmental termination of freedom of

movement through means intentionally applied." Brower v. County of Inyo, 489 U.S. 593,

596-597 (1989)(emphasis omitted).  A claim of "excessive force in the course of making [a]

... 'seizure' of [the] person ... [is] properly analyzed under the Fourth Amendment's

'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989).  The

Tenth Circuit Court of Appeals recently set forth the applicable Fourth Amendment standard

in Casey, supra:

> The Fourth Amendment forbids unreasonable
> seizures, including the use of excessive force in
> making an arrest.  To determine whether the force
> used in a particular case is excessive "requires a
> careful balancing of the nature and quality of the
> intrusion on the individual's Fourth Amendment
> interests against the countervailing governmental
> interests at stake." Graham[ ], 490 U.S. [at] 396
> ...(internal quotation marks omitted).     The
> ultimate question "is whether the officers' actions
> are objectively reasonable in light of the facts and
> circumstances confronting them." Id. at 397, 109
> S.Ct. 1865 (internal quotation marks omitted).
> This determination "requires careful attention to
> the facts and circumstances of each particular
> case, including the severity of the crime at issue,
> whether the suspect poses an immediate threat to
> the safety of the officers or others, and whether he
> is actively resisting arrest or attempting to evade
> arrest by flight." Id. at 396, 109 S.Ct. 1865.

Casey, 509 F.3d at 1281.     Because "[t]he test of reasonableness under the Fourth

Amendment is not capable of precise definition or mechanical application," Graham, 490

U.S. at 396 (internal quotation omitted), courts must "slosh our way through the factbound

morass of 'reasonableness.'" Scott, __ U.S. at __, 127 S.Ct. at 1778.  In all circumstances,

"[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (quoting Terry v. Ohio, 392 U.S. 1, 20-22 (1988)).  See Saucier v. Katz, 533 U.S. 194, 207 (2001)("Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").

Here, it is not disputed that Defendants Adams and Collins entered Plaintiff's residence after being advised that Plaintiff was suicidal, had taken an overdose of prescription medication, and had slit his wrists.  It is also undisputed that before entering Plaintiff's residence the officers had observed a note on Plaintiff's door stating his intent to commit suicide.  It is further not in dispute that the officers found Plaintiff in a bathtub holding a knife to his throat, that the officers repeatedly ordered Plaintiff to drop the knife, and that Plaintiff refused to drop the knife and threatened to kill the officers if they did not leave his residence.  It is also undisputed that Plaintiff came toward Defendant Adams holding the knife and challenged Defendant Adams to shoot him.

Balancing these facts in applying the Graham analysis, the use of nonlethal force in the form of the Taser[16] was objectively reasonable under the circumstances.  Two of the factors identified in Graham as crucial to the reasonableness analysis - whether the individual posed an immediate threat to the safety of the officers or others and whether the individual

---

[16]See Sanders v. City of Fresno, 551 F.Supp.2nd 1149, 1168 (E.D. Cal. 2008)(recognizing "case law indicates that Tasers are generally considered non-lethal or less lethal force)(citing cases).

was actively attempting to evade law enforcement's legitimate directives - are present. Graham, 490 U.S. at 396.  Defendants Adams and Collins could reasonably have believed that Plaintiff had the ready means to carry through with his suicide threat, either by using the knife on himself or by taking actions designed to commit "suicide by police" by attempting to goad the officers to shoot him, by acting aggressively toward the officers, and by threatening to kill the officers.  Assuming Plaintiff was in a bathtub of water and that one or more of the Taser's darts actually contacted with Plaintiff, and that employing the Taser while Plaintiff was in a bathtub of water posed a significant risk to Plaintiff's health, the Graham standard explicitly makes "allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Id. at 397. Under the circumstances that are undisputed in this case, a reasonable officer could believe that employing the Taser, when Plaintiff refused to drop the knife after repeated warnings and after Plaintiff acted aggressively by moving toward the officers holding the knife in his hand, constituted a necessary level of force for the situation.  It is undisputed that Plaintiff continued to threaten to assault or kill the officers after the first and second shots were fired from the Taser. In Hinton v. City of Elwood, Kan., 997 F.2d 774,781 (10th Cir. 1993), the Tenth Circuit Court of Appeals found that the repeated use of a "stun gun" by officers upon the plaintiff and physical force involving "wrestl[ing]" the plaintiff to the ground was not constitutionally excessive where the plaintiff admitted that at that point he was actively and openly resisting the officers' attempts to restrain him with handcuffs).   Under the

21

circumstances present at the time, a reasonable officer could believe that employing the Taser a second and third time constituted a necessary level of force for the situation. <u>See</u> <u>Burkett v. Alachua County</u>, 250 Fed.Appx. 950, 953, 2007 WL 2963844, *2 (11th Cir. 2007)(where detainee demonstrated altered mental state and earlier aggression including biting an officer, officer could have believe that use of Taser was reasonably necessary force in order to secure blood sample from detainee and thus no excessive force was used in violation of Fourth Amendment).

It is also not disputed that after Plaintiff was handcuffed he attempted to engage in physical combat with the officers.  Plaintiff alleges in his Complaint in count two that "[p]olice report they then handcuffed plaintiff, his hands turned white from loss of circulation, plaintiff refused medical attention, police officers ushered EMSA, fire/medical from residence and all officers report of Assault, Battery, and TASERING, again, of handcuffed plaintiff to 'coerce' through 'force [and] fear' plaintiff's submission to accept medical attention." Complaint, at 3.  In count three, Plaintiff alleges that "[o]fficers all report of assault and battery, TASER useage after handcuffed, upon plaintiff until plaintiff was 'beaten into submission' to 'accept medical treatment.'" Complaint, at 4.  In this circuit, a plaintiff's complaint is "treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury." <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1111 (10th Cir. 1991).  Here, Plaintiff's verified Complaint refers to the statements made by Mustang police officers in their "police reports" rather than relying on facts within his personal knowledge.  Nevertheless, it is not disputed that after Plaintiff was handcuffed

and because he continued to be physically combative and resist being restrained, the officers used a "drive-stun" technique and manual strikes to Plaintiff's neck.   The Tenth Circuit Court of Appeals has recognized that "[u]nder certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." Novitsky v. City of Aurora, 491 F.3d 1244, 1254 (10th Cir. 2007).   Under the circumstances present at the time of the use of physical force upon the Plaintiff, a reasonable officer could believe that using physical force, including a "drive-stun" and manual strikes to Plaintiff's neck, after he refused to be transported for treatment and again became combative despite being handcuffed, in order to restrain Plaintiff so that he could be transported to a hospital for medical and mental health treatment constituted a necessary level of force for the situation.

Additionally, it is not disputed that Plaintiff continued to be combative in the ambulance and at the Hospital, that after he was admitted to the Hospital he threatened to kill a nurse and removed an intravenous line, that he expressed a desire to kill himself at the Hospital, that he was "verbally abusive and violent" toward the Hospital's staff, and that an attending psychiatrist at the Hospital ordered "suicide precautions" and restraints.  Plaintiff has not alleged that he was injured as a result of the restraints that were used on Plaintiff for not more than 24 hours.  Under the circumstances, a reasonable officer could believe that Plaintiff posed an immediate threat to the safety of himself or to others and that leaving wrist and ankle restraints on Plaintiff while he was being treated for a drug overdose at the Hospital and until he was transferred to another hospital the following day constituted a

necessary level of force for the situation.  Plaintiff alleged in the Complaint that his "hands turned white from loss of circulation" after he was handcuffed, but there is no admissible evidence of actual or lasting physical or psychological injury from the handcuffing of Plaintiff or from the maintenance of wrist and ankle restraints on Plaintiff during his stay at the Hospital.  Accordingly, Plaintiff's allegations that the failure to loosen the handcuffs placed on him before he was transported to the Hospital and the failure to remove the wrist and ankle restraints after he was transported to the Hospital are not sufficient, as a matter of law, to show excessive force where the undisputed facts show Plaintiff continued to be aggressive toward Hospital staff and to resist being treated by Hospital staff for his drug overdose/attempted suicide.  See Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007)(failure to adjust handcuffs of arrestee after arrestee complained handcuffs were too tight was not excessive force in violation of Fourth Amendment where there was no evidence of actual injury other than "red marks that were visible for days afterward").

Thus, Plaintiff has failed to show that a constitutional violation occurred with respect to his claims of unreasonable seizure and excessive force in counts two and three of the Complaint.  Accordingly, it is recommended that the Motion for Summary Judgment by Defendants Crawford, Six, Davis, Adams, Brown, Collins, and James on the basis of qualified immunity be granted with respect to Plaintiff's claims against these Defendants in counts two and three of the complaint.  Moreover, even if genuine issues of material fact exist as to whether a reasonable officer would have perceived that Plaintiff was likely to harm himself or to harm the officers such that nonlethal and physical force was necessary to

restrain Plaintiff in the face of his refusal of medical treatment, summary judgment in favor of the individual municipal Defendants is appropriate. No controlling authority has been found in which a court has held police officers' conduct to be unconstitutional "under facts not distinguishable in a fair way from the facts presented in the case at hand." Saucier, 533 U.S. at 202. Accordingly, on the basis of the "clearly established" step of the qualified immunity doctrine, the individual municipal Defendants are entitled to qualified immunity and summary judgment.

VII. Failure to Train

Plaintiff implicitly alleges in his Complaint that Defendant City of Mustang's failure to train Mustang police officers "in dealing with mentally ill individuals and use of Taser" constitutes deliberate indifference to the rights of such persons. Complaint, at 2 (back of page). A municipality may not be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior. Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 698 (1978)). A municipality may be found liable under § 1983 only when the municipality itself causes a constitutional violation. City of Canton v. Harris, 489 U.S. 378, 385 (1989). Relevant to the allegations in Plaintiff's Complaint, a municipality may be responsible for a constitutional violation when the municipality's failure to train its employees reflects a deliberate indifference to constitutionally protected rights. Id. at 389. However, there is no municipality liability under § 1983 unless the municipality was the "moving force behind the constitutional violation." Id.

It is not clear from the Complaint what the exact basis is for Plaintiff's allegation of deliberate indifference to his safety.  However, in the absence of an underlying constitutional violation by a City of Mustang employee, there can be no liability on the part of the City of Mustang.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the department regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1264 (10th Cir. 2008)("[W]ithout the predicate constitutional harm inflicted by an officer, no municipal liability exists....Because no constitutional violation exists here, the district court properly granted summary judgment on the claims against the City and County of Denver."). Based on the foregoing findings, it is recommended that the Motion for Summary Judgment by Defendant City of Mustang be granted.  In view of the above findings and recommendations, it is not necessary to review the merits of the municipal Defendants' alternative grounds for summary judgment, including the failure of Plaintiff to allege personal participation by Defendants Six and Davis.

<u>RECOMMENDATION</u>

Based on the foregoing findings, it is recommended that the Motion for Summary Judgment by Defendants Crawford, Six, Davis, Adams, Brown, Collins, and James be GRANTED on the basis of qualified immunity,  that the Motion for Summary Judgment by Defendant City of Mustang be GRANTED, and that judgment issue in favor of the municipal

Defendants and against the Plaintiff.  The parties are advised of their respective right to file an objection to this Second Supplemental Report and Recommendation with the Clerk of this Court by  October 27th , 2008, in accordance with 28 U.S.C. § 636 and LCvR 72.1.  The failure to timely object to this Second Supplemental Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Second Supplemental Report and Recommendation partially disposes of the issues referred to the undersigned Magistrate Judge in the captioned matter.[17]

ENTERED this   6th   day of _____October_____, 2008.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE

---

[17]Should this Second Supplemental Report and Recommendation be adopted and judgement enter in favor of the municipal Defendants, the only remaining Defendant in this case is Canadian Valley Regional Hospital, whose motion for summary judgment was previously denied.  Although the Court did not foreclose the filing of a second motion for summary judgment by this Defendant, no second dispositive motion has been filed by this remaining Defendant as of this date.